WILLIAM N. CAMP AND EUGENE E. WEST, APPELLANTS,
VS. BENJAMIN E. MCLIN AS COMMISSIONER OF AGRICUL-
TURE OF THE STATE OF FLORIDA, AND THE FLORIDA NAVAL
STORES AND COMMISSION COMPANY, A CORPORATION
ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE
OF FLORIDA, APPELLEES.

1. Under section 3066 Revised Statutes, a contractor for State
convicts is required to give a bond, and such bond must
be approved by the Board of Commissioners of State In-
stitutions before either his contract or the bond shall be
of any effect. The courts can not in any case compel the
approval of such bond, or treat such bond as approved
notwithstanding its disapproval, because the matter of
approval rests in the discretion of the board, and this
discretion is not subject to judicial control.

2. Where a statute prescribes the terms upon which the State
is to be bound by a contract executed by a public officer
in its behalf, and declares that a failure to comply with
such terms will result in no contract, such statute is
mandatory, and constitutes a limitation upon the power
of the officer to bind the State by such contract.

3. Where a public officer undertakes to bind the State by a
contract made in its behalf, he must possess a real, as
distinguished from an apparent, authority, derived from
statute, and if the authority does not exist the State can
not be held bound by such contract upon the theory that
the officer has so conducted himself with respect to the
contract as to estop himself from denying its validity.

4. Though the Board of Commissioners of State Institutions
formally approves a contract for the hire of State con-
victs made by the Commissioner of Agriculture under sec-
tion 3065 Revised Statutes, the State is not bound by
such contract where nothing is done in performance there-
of by either party except the delivery to the Commission-

er of Agriculture by the contractor of a sum of money as an advance payment under the terms of the contract, and the board refuses to recognize the alleged contract or to approve the contractor's bond, and the advance payment is returned or offered to be returned to the contractor by the Commissioner of Agriculture.

5. Where the Board of State Institutions prepared a bond to be executed by a contractor 'of State convicts with two sureties, and delivered the same to the contractor to be executed, but the names of the proposed sureties were not mentioned nor agreed upon, and such bond was then executed by the contractor who subsequently procured two solvent sureties to execute it and delivered same to the Commissioner of Agriculture, who at a subsequent meeting of the board presented the contract with the contractor which the board proceeded to disapprove and reject, there was no valid contract binding the State, for the reason that the acts of the board stated would not constitute an approval of the bond, and such approval of the bond is necessary to the validity of such contract under section 3066 Revised Statutes.

Appeal from the Circuit Court for Leon county.

STATEMENT.

On October 22nd, 1901, appellants filed their bill in equity against appellees in the Circuit Court of Leon county, alleging that on February 13, 1901, the Board of Commissioners of State Institutions, consisting of the Governor, Secretary of State, Treasurer, Comptroller, Superintendent of Public Instruction, Attorney-General and the defendant McLin, Commissioner of Agriculture, was in session, a quorum being present, for the purpose of transacting such business as might come before it; that at and during said session on said day the board

made to complainants the direct and distinct proposition and offer to lease to complainants three hundred State convicts at the price of one hundred dollars each per annum, for the period of four years, commencing January 1, 1902, ten dollars for each of said convicts to be paid down in cash by complainants upon the execution of a contract embracing said proposition and offer and all other usual provisions of such a contract; that thereupon complainants being then and there present and represented at said session, immediately accept said proposition and offer unconditionally, and thereupon the board at said session on said day by and through the Governor and in the presence of said Board, then and there drafted and proposed a written contract of lease, embracing the said proposition and offer and the said terms and provisions, which said contract was drafted and prepared by filling up the blanks in a type-written form of a contract that the board had prior to said day prescribed and adopted as being in accordance with the laws of Florida in such cases provided; that immediately after said contract was prepared and on the said day said McLin as Commissioner of Agriculture voluntarily and by the direction and request of said Governor, and by the request of the board and in its presence, executed said contract by signing his name thereto officially and affixing his private seal, that thereupon on the said day each of the complainants executed said contract by signing his name thereto and affixing his private seal, which execution was in the presence of and duly attested by two competent witnesses, and said contract so executed was on the next day delivered to said McLin, Commissioner, and received by him; that at said session the said board, by and

through the said Governor, drafted and prepared a bond
with two sureties, in the penal sum of $7,500, conditioned
in accordance with the laws of Florida in such case made
and provided to secure the due performance of such
contract, and delivered same to complainants to be ex-
ecuted by them and by such sureties; that said bond was
dated February 13, 1901. and on said day was duly ex-
eucted by each of the complainants signing his name and
affixing his seal thereto; that W. S. West and C. B. Rog-
ers, sureties named in said bond, did on said day duly ex-
ecute the same by each signing his name and affixing his
seal to the same, which execution of said bond by com-
plainants and said sureties was done in the presence of
two competent witnesses; that on the same day the said
W. S. West and C. B. Rogers each for himself verified and
swore to an affidavit before a notary of said State to the
effect that each of them possessed in the State of Florida
sufficient property to make good the amount mentioned
in the bond, unencumbered and not exempt from sale
under legal process; that each of complainants and each
of said sureties is the owner of property in the State of
Florida subject to sale on execution, which is worth sev-
eral times the amount of the penalty of said bond and
not subject to exemption under the laws of the State; that
on the fourteenth day of February, 1901, complainants
delivered said bond, executed and proven as aforesaid
to the said McLin, Commissioner, and on said day deliv-
ered to him $3,000, in U. S. currency, said sum being the
amount required to be paid down by said board and by
said contract; that said McLin, Commissioner, on said
day officially received said bond and said sum of $3,000,
33 S. C.

and gave complainants a receipt thereof; that said con-
tract was approved by said board at the time same was
executed in the manner and form previously alleged, and
that afterwards, to-wit: on March 2, 1901, said board
had no power or authority to reject or abrogate said con-
tract.

The bill further alleged that since the execution of the
contract the board and McLin, Commissioner, had adver-
tised for bids for convicts to be received not later than
March 20th, 1901; that under color of such advertise-
ment other and further bids leasing all the State convicts
had been made, including the three hundred so leased to
complainants; that the board and commissioner had re-
ceived and entertained said bids; that afterwards, about
June 28th, 1901, the commissioner with the approval of
the board entered into another contract with the defend-
ant, the Florida Naval Stores & Commission Company,
as lessee, by the terms of which the commissioner had co-
venated and bound himself to lease and deliver to said de-
fendant company on January 1, 1902, all the convicts and
prisoners of the State, including the three hundred so
leased to complainants; that although the defendant com-
pany had full notice of complainants' contract, and the
contract of the defendant company was subsequent
and subject to the contract with complainants,
McLin, Commissioner, would deliver all of said
convicts to defendant company in accordance
with its contract unless enjoined by the court; that
McLin, Commissioner, refused in any manner to rec-
ognize the contract with complainants as an existing con-
tract, and refused to retain such possession and control
of said three hundred convicts as to be able to deliver

said convicts to complainants under the terms of their contract, and had declared his intention not to deliver said convicts or any of them to complainants at the time specified in and by the terms of said contract, although it is his duty under the statutes of the State to retain such possession and control of said three hundred convicts so as to be able to deliver them to complainants in accordance with the terms of the contract so made with them.

It was further alleged that said contract and bond contained and embraced all the covenants and provisions required by the laws of Florida to be included in said contract and bond; that such contract was a perfect contract, and such bond a perfect bond, and that both were perfectly executed; that neither said board, nor any member thereof, ever made any objection to the substance, execution or sufficiency of  said bond, and that it was legally impossible to make any such objection or any valid objection to said bond; that more than two weeks after the execution and delivery of said contract and bond, and the payment of said sum of $3,000, complainants received by mail from said McLin, Commissioner, a copy of a paper writing to the following effect: "Copy of order of Board of State Institutions, March 2, 1901.  Hon. B. E. McLin, Commissioner of Agriculture, submitted to the board certain contracts he had entered into with different parties for the hire of State convicts for four years beginning January 1, 1902, and upon consideration it is ordered that the contracts be and are hereby severally disapproved and rejected, and it is further ordered that this order be endorsed on each of said contracts by the secretary of this board;" that the word "contracts" in

said writing contained included, and was intended by the said board to include, said contract made and executed with complainants; that under and by virtue of the pretended authority of said writing, said McLin, Commissioner, arbitrarily, wilfully and without any good reason whatever, immediately after the date thereof announced his intention to repudiate and refuse to perfom said contract to the great wrong and injury of complainants; that said writing, to-wit: the order of said board was a wilful, arbitrary and capricious act, and not founded upon any reason whatever; that a few days after the date of said writing complainants notified said board and McLin, Commissioner, in writing that the contract with complainants was a valid contract, obligatory upon all parties thereto and that complainants would insist upon and demand performance of said contract by the said McLin, Commissioner, and the said board; that complainants were informed and believed that the contract so made with the defendant company contains a provision, condition, reservation and exception whereby the lessee in said contract takes and holds all its rights thereunder subject to all the rights and interests of complainants under their contract.

The bill also alleged that the present number of convicts in the State prison was about eight hundred, and would on January 1st, 1902 exceed six hundred; that by the terms of the contract with complainants it was the duty of McLin, Commissioner, to prescribe a plan and basis for a fair and equitable division of the State convicts with the approval of the board, and the duty of the board under such contract to approve the same; that it was necessary that such plan and basis should be pre-

scribed without delay, in order that complainants might make provisions for the reception,   custody, care, main-tenance, employment and   disposition of said convicts; that complainants were then in possession and would on January 1, 1902, have possession of about three hundred convicts under contract made by the Commissioner of Agriculture expiring December 31, 1901, which it was claimed complainants would be entitled to retain until the three hundred convicts mentioned in the contract of February 13, 1901, are delivered to complainants in accordance with its terms; that the actions and doings of the defendants, after the contract with complainants and the bond was made, complained of in the bill, have the effect to impair the obligations of "said commissioner" and to deprive complainants of their property and rights under their contract without due process of law; that such actions and doings constituted an invasion of complainants' rights guaranteed by the constitutions of Florida and the United States.

The bill prays that the court decide and declare that the contract of February 13, 1901, is a valid contract; that complainants are entitled to possession of the prisoners or convicts provided for therein according to its terms; that McLin, Commissioner, be temporarily and permanently enjoined and restrained from refusing or failing forthwith to prepare and submit for the approval of the board a plan and basis for a fair and equitable division of the State convicts, so that the number contracted to be delivered under complainants' contract may be delivered to them in accordance with its terms, and from refusing to deliver said convicts according to the contract; that defendants be temporarily and permanently

enjoined from taking from the possession, control or custody of complainants any convicts which complainants might have in their custody up to the number of three hundred; that the defendant company be enjoined temporarily and permanently from receiving, retaining, having, controlling, working, employing, hiring out or in any manner interfering with any State prisoners or convicts until McLin, Commissioner, shall have prescribed and the board shall have approved a plan and basis for a fair and equitable division of State convicts, so that the number contracted to be delivered to complainants may be delivered in accordance with the terms of their contract.

The bill also prays for general relief and subpoena.

By an amendment of the bill a copy of the contract of February 13, 1901, was attached as an exhibited and made a part of the bill. It is signed by B. E. McLin, Commissioner of Agriculture, and by W. N. Camp and E. E. West, under the private seals of the parties, and purports to have been signed, sealed and delivered in the presence of C. H. Dickinson and E. E. Philbrick, subscribing witnesses. It purports on its face to have been made and entered into February 13, 1901, under and in pursuance of sections 3065, 3067, 3069, 3070, 3072, 3073, 3074, 3075, 3077, and 3078 Revised Statutes of Florida, "being Article 7 of said Revised Statutes contract for labor of State prisoners," between B. E. McLin, Commissioner of Agriculture, for and on behalf of said State under the provisions of said statutes, party of the first part, and W. N. Camp and E. E. West, parties of the second part. It provides that said W. N. Camp and E. E. West for and during the period of four years commencing January 1,

1902, and ending December 31, 1905, shall have the use of and enjoy the control, labor, services, use and custody of three hundred State prisoners of the whole number of persons whether male or female who may on the first day of January, 1902, be under sentence of imprisonment in the State prison of the State, and their proportionate share of State prisoners to maintain said contract number of the whole number of persons whether male or female who may during said period of four years be sentenced by any court of Florida of competent jurisdiction to imprisonment in the State prison. The contract contains a stipulation to the effect that the lessees shall and will execute a good and sufficient guaranty or other bond payable to the Governor of the State and his successors in office in the penal sum of $7,500, conditioned to secure the faithful performance of the contract as may be required by the party of the first part, with good and sufficient sureties to be approved by the Board of Commissioners of the State Institutions. It also contains many other stipulations and provisions which it is not deemed necessary to set forth in detail, including a provision to the effect that said contract or lease is to be construed by the Board of Commissioners of State Institutions with the lessees of State convicts, that all leases or contracts shall be placed upon an equitable or fair basis maintained so far as practicable and the division of said convicts shall be made at all times on such plan and basis as said Commissioner of Agriculture may prescribe, with the approval of the Board of Commissioners of State Institutions, fairly and proportionately during said four years lease or contract.

The defendant McLin, Commissioner, filed his answer

to the bill, therein insisting and reserving as grounds of demurrer, that the suit was in substance a suit against the State, and that there was no equity in the bill. The defendant company filed its demurrer asserting, among other grounds, the matters assigned as grounds of demurrer in the answer of its co-defendant, and in addition thereto, specifically, that there was no valid contract between complainants and the defendant McLin, Commissioner, as the bill failed to show that the contract and bond given to secure the performance thereof had ever been approved by the Board of Commissioners of State Institutions as required by law. The cause was brought on for hearing upon the demurrers and upon application for temporary injunction prayed in the bill. The court made an order as follows: "This cause came on to be heard on the demurrer to the bill and the application for a restraining order and was argued by counsel, and upon consideration thereof, it is the opinion of the court that the demurrer is good, and that the suit is really against the State of Florida, therefore it is ordered, adjudged and decreed that the demurrer be sustained; that the application for a restraining order be denied, and that the suit be dismissed, and that the plaintiffs pay to the defendants their costs by them about their defense in this behalf expended. Done and ordered at chambers, this 23rd day of December, A. D. 1901." From this decree this appeal was taken, and the errors assigned question the propriety of the decree. Various affidavits were filed at the hearing, which, in view of the conclusions reached by the court, it is not necessary to notice.

The other facts are stated in the opinion of the court.

*H. Bisbee,, Geo. C. Bedell, Cooper and Cooper and, O. T. Green* for Appellants.

*T. L. Clarke, R. W. Williams, D. U. Fletcher* and *Stephen E. Foster,* for Appellees.

PER CURIAM *(after stating the facts.)*

This cause has been referred by the court to its commissioners, who report that the judgment ought to be affirmed, and the court having duly considered the case upon the record, briefs and argument is of that opinion.

By section 2 of Article XIII, constitution of 1885, which deals with the subject of public institutions it is provided that "A State Prison shall be established and maintained in such manner as may be prescribed by law." Section 26, Article IV provides, among other things, that the Commissioner of Agriculture shall "have supervision of the State Prison." Section 17 provides that "the Governor and the administrative offices of the Executive Department shall constitute a Board of Commissioners of State Institutions, which board shall have supervision of all matters connected with such institutions in such manner as shall be prescribed by law." The legislature of 1889 passed an act entitled "An Act to Establish and Maintain a State Prison and Provide for the Employment of Persons Convicted of Crime and Sentenced to the State Prison and for the Custody, Mainainance and Discipline of such Convicts, and for Other Purposes." Chapter 3883 acts of 1889. Most of the provisions of this act were incorporated into the Revised Statutes of 1892, beginning with section 3065 of that revision. It is unnecessary to

refer to those provisions of the revision providing for the establishment, maintainance and discipline of a State Prison,, but only to a few of those relating to contracts for the labor of State prisoners. By sections 3065 it is provided that the Commissioner of Agriculture, with the approval of the Board of Commissioners of State Institutuions, may enter into contracts with any person or persons for the labor, maintainance and custody of any or all prisoners sentenced to, or confined within, the State Prison, in such manner as the said board may deem most advantageous to the interests of the State and with due regard for the health, humane treatment and safe custody of the prisoners; that such contracts may be made for a term of years, not exceeding four; that such contracts may provide for surrendering the control and custody of the prisoners to the person or persons contracting for their labor, subject to such supervision of the Commissioner of Agriculture as is provided by that article of the revision, and for the payment to the State by such person or persons of such sums of money for the labor of such prisoners on such contracts as may be deemed advantageous to the interests of the State, which said sums of money shall be paid to the State Treasurer in accordance with the tems of the contract or contracts. It also provides that, in case the Commissioner of Agriculture does not receive any applications to pay the State for the labor of such prisoners, then he shall enter into such contracts with the approval of the board for the payment by the State to any person or persons of such sums of money for taking such prisoners on such contracts as may be deemed advantageous to the interests of the State. Section 3066 provides that "such contractor or contractors shall give

bond with two or more sureties in a sum not exceeding twenty thousand dollars, payable to the State, to be prescribed by the Board of Commissioners of State Institutions and conditioned for the faithful performance of such contract and the duties imposed by this Chapter, and such contract and bond shall be approved by the Board of Commissioners of State Institutions before either shall be of any effect, and they shall be filed in the office of the State Treasurer."

An essential question involved here is whether upon the allegations of the bill, the appellants have a valid contract as claimed. The provisions of section 3066 Revised Statutes above quoted require that a bond be given and declare that "such contract and bond shall be approved by the Board of Commissioners of State Institutions before either shall be of any effect." This language is plain and unambiguous. It requires the contract and bond to be approved, and declares in unmistakable terms that their effectiveness shall be conditioned on approval. It must be borne in mind that section 3065 had already provided that any contract should be approved by the board, and, if the contract were to become operative ,as such, upon its approval section 3066 need only have referred to the approval of the bond, but that section expressly provides for the approval of the contract and bond "before *either* shall be of any effect." Under the terms used the failure to secure such approval leaves both the contract and bond without any effect. The effect of this statute is to make an *approved bond* a necessary concomitant of a consummatedly effective contract. The evident purpose of this provision was to guard against the possibility of the State being bound

by an enforceable contract without security for its faithful performance by the lessee satisfactory to the board, which is by the law invested with the power of supervision over the convicts, even when such convicts are in possession of the contractor. In order to secure this very important object the statute makes the approval of the bond a conditional precedent to the validity of the contract. The approval of the bond being made a condition precedent and in the present case operating also as a limitation upon the power of the officers to contract, the parties must be presumed to have had in mind this condition and limitation in negotiating the contract. Each, it is reasonable to suppose, negotiated with the other upon the assumption that the bond must be given and approved before the State's liability upon the contract would arise, and even if they did not so negotiate, the State could not be bound without the giving and approval of the bond, because the statute plainly so declares. It is claimed by appellants that the law does not require written evidence of the board's approval, or that the approval of the contract and bond be shown by the records of the board, or a formal declaration by the board that the contract and bond are approved, but that any act or conduct on the part of the board which shows that it accepts, or is satisfied with the contract and with the bond given to secure it, will be deemed in law an approval. For the purpose of this case we may admit that such is the law, and that under such view of the law the action of the board in making the proposition to appellants, in drafting the contract and directing the Commissioner to execute it as drafted. constituted an approval of the *contract,* as distinct from the bond, its concomitant, which the

meaning of the statute. The allegations with reference
to the bond show that the board through the Governor
drafted and prepared a bond to be executed by appellants
and two sureties and delivered same to appellants to be
executed by themselves and two sureties, but it is not al-
leged that the names of the sureties were agreed upon
or discussed, nor that the board agreed to accept W. S.
West and C. B. Rogers, the parties named in the bond
subsequently delivered to the Commissioner of Agricul-
ture, as such sureties or knew that these gentlemen would
be tendered. The parties evidently did not consider that
the board had approved the bond at the time it was
drafted, for one provision of the contract bound the ap-
pellants *thereafter* to give a bond *to be approved by the
board.* Under these circumstances how can it be said
that the board approved a bond not then executed, the
sureties upon which were not then determined? Even
if the board could lawfully have bound itself in advance
to approve a bond to be thereafter executed by good and
sufficient sureties (the approval of the bond being a mat-
ter resting in discretion, Cope & Stewardson v. Hastings,
183 Pa. St. 300, 38 Atl. Rep. 717), it does not appear from
the allegation of the bill that it attempted to do so, and
therefore it does not appear that he bond was approved.
Auhorities have been cited to the effect that where parties
have given bonds required by some law or by contract in
order to authorize some action, and a party has proceeded
to do the act and the bond is found in the possession of the
party or tribunal whose duty it was to approve it, with no
evidence of its disapproval, or where the terms of the
bond and the names of the sureties are previously agreed
upon, and such a bond is afterwards found in the posses-

sion of the party whose duty it was to approve it, and the party for whose benefit the bond was given has permitted the performance of acts which the bond was given to secure, the bond will be deemed by the law to have been approved. The facts in this case do not, however, bring it within the rule announced in those cases, for no act in performance of the contract has been done by appellants, except the deposit with the Commissioner of Agriculture of the $3,000 and the bond, neither of which have ever been accepted or approved by the board, the board proceeded within about two weeks to disapprove the contract, which the bond was given to secure, and ever since has declined to recognize it, thereby announcing unequivically its purpose to refuse its approval of any bond in consummation of such contract. Besides, it does not distinctly appear that the bond delivered to the Commissioner was ever presented to the board, or that the latter knew that it had been executed and delivered to the Commissioner; certainly not prior to the day it adopted the resolution disapproving the contract. Under these circumstances it can not be said that the bond was ever approved by the board. It is insisted in argument that the provision of the statute relating to the giving and approval of the board is directory nearly; that a good and sufficient bond having been tendered, it was the duty of the board to approve it; that its refusal to do so was a capricious and arbitrary act, and under such circumstances the court ought to treat the bond as sufficient under the law, and either regard the bond as approved or its formal approval as being immaterial.

A statute which requires a thing to be done, and declares in plain and unmistakable terms the legal conse-

quénces to flow from a failure to do it, must generally be regarded as mandatory, and especially where, as in this case, the requirement is made a condition precedent to any effectiveness of a contract authorized to be made on behalf of the State. People ex rel v. Dulaney, 96 Ill. 503; Agent of State Prison v. Lathrop, 1 Mich. 438; State ex rel. v. Hogan, 22 Mont. 384, 56 Pac. Rep. 818; Penitentiary Company No. 2 v. Rountree, 113 Ga. 799; Bladen v. Philadelphia, 60 Pa. St. 464; Pearse v. Morrice, 2 Ad. & El. 84; Sutherland on Stat. Cons. sections 446, 447; Endlich on Int. Stat. section 431. The statute prescribes the terms upon which the State is to be bound by a contract authorized to be made in its behalf. It declares that a failure to comply with those terms will result in no contract. Unless those terms are complied with, there can be no contract with the State for the obvious reason that neither the State nor an individual can be bound by the terms of a contract to which it or he has not consented. If the clause of the statute under consideration be directory as to the approval of the bond, it is directory also as to the contract, for they are each embraced in the language which declares that "such contract and bond shall be approved by the board * * * before either shall be of any effect." No one, we suppose, would for a moment contend that the provision requiring the contract to be approved is merely directory, and yet this must be so if the provision for approval of the bond be so held. The provisions of the statute requiring the bond to be approved is mandatory, and such approval is a condition precedent to the effectiveness of the contract. Until and unless the bond is approved the contract, though formally approved, is a mere offer upon the part of the State, sub-

ject to be revoked by the Commissioner or rejected by the board at any time or for any cause. It stands precisely upon the same basis as any other proposal, a term of which provides that there shall be no binding obligation until mutual assent is thereafter evidenced at some particular time, or in some particular manner, or upon the happening of some contingency. Even though accepted by the other party, no binding contract is created, and until the condition is performed or the contingency removed either party can recede from the proposed contract. In such cases though the condition is to be performed by one of the parties, he may decline to perform it even arbitrarily and without reason, and thereby prevent the offer from becoming a binding contract. This results from the principle that a party must assent to the precise terms of a proposed contract, unconditionally, in order to bind him by such contract. The principle is well illustrated by the many cases which hold that even though the precise terms of a contract are agreed upon, yet if it is understood by the parties that the contract is not to become binding unless reduced to writing and signed by the parties, neither party is bound by such contract until it is reduced to writing and signed; and in such cases if the contract be in fact reduced to writing and signed by one party, the other is not bound unless he signs, even though his refusal to sign be arbitrary and without reason. Chinnock v. The Marchioness of Ely, 4 DeG. J. & S. 637; Morrill v. Tehama Cosolidated M. & M. Co., 10 Nev. 125; Dietz v. Farish, 53 How. Pr. Rep. 217; Pollock on Contracts, p. 41; 1 Parson on Contracts, p *477 note; 1 Addison on Contracts, *15. And this rule applies especially to public officers contracting on be-

half of the public.   If the statute or authority to act requires the contract to be written, or it is so agreed, as a condition precedent to its effectiveness, the condition must be performed to make the contract binding, and until this is done the negotiations may be discontinued at any time by the officer.   Capital Printing Co. v. Hoey, 124 N. C. 767; 33 S. E. Rep. 160; State *ex rel.* v. Hogan 22 Mont. 384, 56 Pac. Rep. 818; Edge Moor Bridge Works v. County of Bristol, 170 Mass. 528, 49 N. E. Rep. 918; Water Commissioners of Jersey City v.   Brown, 32 N. J. L. 504; Eads v. City of Carondelet, 42 Mo. 113; 29 L. R. A. note, p. 434.   The bill alleges and the demurrer admits that the bond tendered by appellants was sufficient, and properly executed.   But this does not dispose with the requirements that it be approved by the board as a prerequisite to the effectiveness of the contract.   The law placed no limitations upon the power of the board to reject it and thereby prevent the contract from becoming effective.   Nor can the court treat the bond as approved because it is found to be a proper one to be approved by the board—nor treat its approval   as immaterial.   The approval is a matter in the discretion of the board made so by statute, and as we have shown constitutes a condition precedent, material to the making of the contract.   If the board has arbitrarily exercised its discretion in a matter as to which it owed no legal duty to the appellants, the members must answer to the people who elected them and not the courts, for the latter are given no supervisory power over the board in such matter invested in its discretion.   The statute nowhere makes it a duty on the part of the board to approve the

34 S. C.

bond if a valid and legal one is tendered. If there was
a duty imposed to approve the bond, the courts might
compel approval in proper cases, but where no duty is
imposed, the courts can neither compel such approval, nor
dispense with it, when made a condition precedent to the
validity of some act. State ex rel. v. Smith, 23 Mont.
44, 57, Pac. Rep. 449. The Commissioner and the board
are by the provisions of the statute invested with a very
broad discrection in the matter of making contracts for
the labor of State prisoners, and must have in view the
State's interest, and the health, humane treatment and
safe custody of the prisoners in making or approving
such contracts. They are not by the statute required to
advertise for bids, or to let a contract to the highest or
lowest bidder, or to any particlar class of persons or for
any particular class of work. While the statute does not
expressly require the contract to be in writing, its pro-
visions can only be complied with by a contract in writ-
ing, because the contract and the contractor's bond are
required to be filed in the office of the State Treasurer.
The Commissioner has no power to enter into a contract
that shall be binding upon the State without the approval
of the board; neither does the statute make it the duty
of the board to approve a contract made by the Commis-
sioner even though the Commissioner believes, and a court
should find as a fact, that such contract is advantageous
to the State and secure to the prisoners every right
which it was the purpose of the law to secure to them.
The power of the board in the matter of approval of
such contracts is an absolute one committed to its discre-
tion, and it can be held answerable for an abuse of such
discretion only by the people from whom its authority is

derived, for no supervisory power over its action is anywhere given to the courts. The Commissioner and the board in making these contracts act as agents of the public, and their authority is derived from a public statute, of which every person must take notice. Under such circumstances the officers or the board must possess a real, as distinguished from an apparent, authority, in order to bind the State by a contract made in its behalf. Carolina National Bank v. State, 60 S. C. 465, 38 S. E. Rep. 629; Throop on Public Officers, section 551; Mullan v. State, 114 Cal. 578, 46 Pac. Rep. 670, 34 L. R. A. 262. We refer to these elementary principles in answer to the argument advanced on behalf of appellants, that the acts and conduct of the Commissioner and the board stop them from denying the validity of the contract set forth in the bill. The doctrine of estoppel when invoked against the State has only a limited application, even when an unauthorized contract on its behalf has been performed, and there by the State has received a benefit, but in cases like the present it has no application at all. Within about two weeks after the alleged contract was made appellants were put upon notice that the Commissioner and the board did not recognize it as an obligation binding upon the State. Appellants did not claim to have expended any money or to have done any act detrimental to their interest upon the faith of the supposed contract, nor has the State derived any benefit whatever from it. Under these circumstances, if there is in law no contract by which the State's right to control the labor and services of the three hundred convicts has been transferred to the appellants by her agents according to the real authority granted them by statute, it would be in

direct violation of law for the courts to compel their delivery under an invalid contract, upon the ground that the agent who made the contract had by his conduct estopped himself from denying the validity of the same. A conclusive answer to such proposition is that the principal, the State, has not delegated to such agent the power to thus estop it. There must be some act or conduct upon the part of the State through its legislature or other competent authority upon which to base such estoppel, otherwise her agent might be assming to act in a matter without authority, and afterwards doing some act or being guilty of such misconduct as to stop him from denying the valadity of his unauthorized act, bind his principal, thus by two wrongful and improper acts outside of the powers committed to him giving life to an act originally beyond the scope of his powers.

In view of the conclusion reached it becomes unnecessary to determine whether this proceeding, is in effect a suit against the State, or whether equity has jurisdiction to grant the relief prayed, in the event a valid conrtact were shown.

The case was heard in the Circuit Court upon bill and demurrer of the defendant company, and on an application for a restraining order. A ground of the demurrer, that there was no completed contract with complainants because it appeared that no bond had been approved, goes to the basis of relief not only against the Naval Stores Company, but also the Commissioner, McLin. It is not insisted that if the demurrer was rightfully sustained on the ground stated the decree dismissing the bill was improper. The Circuit Court correctly sustained

the demurrer, and as it contained a ground extending to the right of recovery to any extent, we affirm the decree dismissing the bill. Ordered accordingly.